RECORD NO. 13-4845

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ANTONIO DAVIS, a/k/a Tank Top,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE  DISTRICT OF MARYLAND
BALTIMORE DIVISION

(Honorable William D. Quarles, Jr., U.S.D.J.)

**OPENING BRIEF OF APPELLANT
ANTONIO DAVIS**

Arthur S. Cheslock
ATTORNEY AT LAW
100 Church Lane
Baltimore, Maryland 21208
(410) 559-3734
acheslock@juno.com

*Counsel for Appellant*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................ ii

STATEMENT OF SUBJECT MATTER AND
APPELLATE JURISDICTION ...............................................................1

STATEMENT OF ISSUES ....................................................................1

STATEMENT OF THE CASE.................................................................2

STATEMENT OF FACTS ......................................................................4

SUMMARY OF THE ARGUMENT .....................................................10

ARGUMENT ........................................................................................11

   I.   WAS THE DISTRICT COURT'S CERTIFICATION OF THE TRIAL TRANSCRIPTS WITHOUT REFERENCE TO THE COURT REPORTER'S BACKUP TAPES AN ABUSE OF DISCRETION DENYING DAVIS HIS FIFTH AMENDMENT RIHT TO DUE PROCESS ..................................................................................11

   II.   WERE THE GOVERNMENT ACTIONS OUTRAGEOUS AND IN VIOLATION OF DUE PROCESS ................................................22

   III.   WAS THE COURT'S ADMISSION OF 404(b) EVIDENCE AN ABUSE OF DISCRETION..................................................................32

   IV.   WHETHER THERE WAS SUFFICENT EVIDENCE TO CONVICT DAVIS FOR POSSESSING A HANDGUN ................................41

CONCLUSION ....................................................................................49

STATEMENT REGARDING ORAL ARGUMENT ..........................49

CERTIFICATE OF COMPLIANCE....................................................50

CERTIFICATE OF SERVICE ............................................................51

# TABLE OF AUHORITIES

## CASES

*Anders v. Califonia,*
  368 U.S. 738 (1967) ...................................................................10, 49

*Butts v. United States,*
  273 F. 35, 18 A.L.R. 143 (8 Cir. 1921) ...................................31

*Hardy v United States,*
  375 U.S. 277, 284 S.CT. 424 (1964) .....................................18, 19

*Hampton v. United States,*
  425 U.S. 484, 96 S.Ct. 1646 (1971) ...................................23, 24, 25

*Mathew v. United States,*
  485 U.S. 58, 105 S. Ct. 883 (1998) .........................................30

*Jacobson v. United States,*
  503 U.S. 540, 112 S.Ct. 1535 (1992) .......................................27

*Pinkerton v. United States,*
  328 U.S. 640, 66 S. Ct. 1180 (1946) ........................................44

*Rochin v. California,*
  342 U.S. 165, 72 S. Ct. 205 (1952)… ....................................24, 26

*Rosemond v. United States,*
  134 S.Ct. 1240 (2014) ...................................................46, 47, 48

*Sherman v. United States,*
  356 U.S. 369, 78 S. Ct. 435 (1958) ....................................28, 31, 32

*Smith v. United States District Court Officers*
  203 F. 3d 440 (7th Cir. 2000) ...........................................21, 22

*Smith v. United States,*
  508 U.S. 223, 113 S. Ct. 2050 (1993) ........................................47

*Sorrells v. United States*,
    287 U.S. 435, 53 S. Ct. 210 (1932) ..........................................28, 29, 31, 32, 36

*United States v. Blackman*,
    764 F.3d 137 (4th Cir. 2014) ...........................................................................44

*United States v. Bran*,
    467 F. 3d 179 (2nd Cir. 2006) ........................................................................38

*United States v. Burkley,*
    591 F.2d 903, 192 U.S. App. D.C. 294 (D.C. Cir. 1978) .........................35, 37

*United States v. Cervantes*,
    706 F.3d 603 (5th Cir. 2013) ......................................................32, 35, 37, 38

*United States v. Dinkins*,
    691 F.3d 358 (4th Cir. 2012) ...........................................................................44

*United States v. Duran*,
    596 F.3d 1283 (11th Cir. 2010) .......................................................................38

*United States v. Girad*,
    646 F. 3d 318 (5th Cir. 2011) .........................................................................32

*United States v. Goodwin*,
    854 F. 3d 33 (4th Cir. 1998) ...........................................................................25

*United States v. Hasan*,
    718 F. 3d 338 (4th Cir. 2013) ....................................................................25, 30

*Unites States v. Huggins,*
    191 F.3d 532 (4th Cir. 1999) .....................................................................19, 20

*United States v. Hunt*,
    749 F.2d 1078 (4th Cir. 1984) .........................................................................38

*United States v. Jacobson*,
    916 F. 2d 467 (8th Cir. 1990)
    (rev *Jacobson v. U.S*, 503 U.S. 540, (1992) .......................................26, 28, 29

iii

*United States v. Jenrette*,
  744 F.2d 817 (240 U.S. App. DC , D.C.Cir)....................................................26

*United States v. Jones*,
  976 F.2d 176 (4th Cir. 1992)........................................................................22

*United States v. Latham*,
  2014 U.S. App. Lexis 14181 at 4-5 (4th Cir. July 25, 2014)..........................49

*United States v. Lentz*,
  524 F. 3d 5011 (4th Cir. 2008)......................................................................39

*United States v. Luttrel*,
  889 F.2d 813 (9th Cir. 1989)........................................................................26

*United States v McLaurin*,
  764 F.3d 372 (4th Cir. 2014)...................................................................*passim*

*United States v. Osbourne* ,
  935 F. F.2d 32 (4th Cir. 1991)......................................................... 25, 27, 37-38

*United States v. Pace*,
  10 F.3d 1106 (5th Cir. 1992)...................................................................... 20-21

*United States v. Parker*,
  No. 13-4989 (4th Cir. 2015) ..........................................................................30

*United States v Queen*,
  132 F. 3d 991 (4th Cir. 1997)....................................................................34, 35

*United States v. Rawle*,
  845 F. 2d. 1244 (4th Cir. 1988)....................................................................35

*United States v. Russell*,
  411 U.S. 423, 93 S. Ct. 1637(1937) ...........................................................24, 28

*United States v. Sanders*,
  668 F.3d 1298 (11th Cir. 2012)......................................................................36

*United States v. Sareum Min*,
704 F.3d 314 (4th Cir. 2013)................................................43, 44

*United States v. Snow*,
595 Fed. Appx 223 (4th Cir. 2015) .................................................44

*United States v. Thomas*,
134 F.3d 975 (9th Cir. 1990)................................................35, 38

## CONSTITUTIONAL AMENDMENTS

U.S. Const. amend. V.................................................................10, 24

## STATUES

18 USC § 2 ...............................................................................2

18 USC § 382(c)(2).....................................................................3

18 USC § 922(g)(1) & (2)...........................................................43

18 USC §924(c) .................................................................*passim*

18 USC § 924(0)..................................................................2, 42

18 USC §1951(a) .......................................................................2

18 USC § 1951(b)(1)...................................................................2

18 USC §3231 ...........................................................................1

18 USC § 3742 ..........................................................................1

21 USC § 841(a)(1).....................................................................2

21 USC § 846 ............................................................................2

27 USC § 753 ...........................................................................21

28 USC § 1291 ..........................................................................1

v

<u>RULES</u>

Fed. R. App. P. 10.....................................................................................11, 18

Fed. R. App. P.10(e) ...............................................................................17, 20

Fed. R. Evid. 403 ...............................................................................34, 35, 39

Fed. R. Evid. 404(b)..............................................................................*passim*

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The District Court had jurisdiction in this case under 18 U.S.C.§ 3231.

Appellate jurisdiction is conferred by 18 U.S.C. § 3742 and 28 U.S.C. §1291. The District Court entered final judgment on Appellant Antonio Davis (Davis) on November 7, 2013, and Davis filed a timely Notice of Appeal on November 12, 2014. (DKTS.132, 135 ).

## STATEMENT OF ISSUES

Whether the government engaged in outrageous conduct in its sting operation.

I. **WAS THE DISTRICT COURT'S CERTIFICATION OF THE TRIAL TRANSCRIPTS WITHOUT REFERENCE TO THE COURT REPORTER'S BACKUP TAPES AN ABUSE OF DISCRETION DENYING DAVIS HIS FIFTH AMENDMENT RIGHT TO DUE PROCESS?**

II. **WERE THE GOVERNMENT'S ACTIONS "OUTRAGEOUS' AND IN VIOLATION OF DUE PROCESS AND CONSTITUTING ENTRAPMENT?**

III. **WAS THE COURT'S ADMISSION OF 404(b) EVIDENCE AN ABUSE OF DISCRETION?**

IV. **WAS THERE SUFFICIENT EVIDENCE TO PROVE DAVIS'S POSSESSION OF A FIREARM**

1

## STATEMENT OF THE CASE

On  January 3, 2013, a five count indictment was filed in the United States District Court for the District of Maryland alleging that Davis and others had from December 12, 2012 until December 20, 2012, in the District of Maryland engaged in a Hobbs Act conspiracy  to obstruct, delay  and affect commerce by robbery, as said term is defined by Title 18, U.S.C. § 1951 (b)(1), by the unlawful taking of narcotics and narcotics proceeds from the person of a victim in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2. (Count 1); conspiracy to distribute five kilograms  or more of a mixture or substance  containing a detectable amount of cocaine, a Schedule 11 controlled substance in violation of 21 U.S.C. §§ 841 (a)(1) & 846, (Count 2); conspiracy to knowingly possess firearms in furtherance of a crime of violence and a drug trafficking crime for which they may be prosecuted in a court of the United States for those afore-stated actions set forth in counts 1 and 2 of the said herein Indictment in violation of 18 U.S.C. § 924(0), (Count 3); the aforestated co-defendants did knowingly and unlawfully possess a loaded Ruger, 22 caliber semi-automatic handgun, serial number 10-09823, in furtherance of the crimes as set forth in counts 1 and 2 of the herein indictment  in violation of 18 U.S.C. §§ 924 (c), (Count 4); and further, that the said defendant, each having been convicted of a crime punishable by imprisonment for a term exceeding one year

2

did knowingly and unlawfully possess the aforesaid firearm in and affecting commerce, Count 5. (ECF No. 28).

Davis was arrested December 20, 2012 (PSR p.1). He made his initial appearance and was ordered detained December 21, 2012. (ECF No. 6 & 8). He was found guilty by a jury on August 8, 2013 on counts 1, 2, 3, 4 and 5. (ECF No. 132).

At sentencing on November 6, 2013, the Honorable William D. Quarles, Jr., USDJ, imposed on Davis concurrent sentences of 235 months on Counts 1, 2, and 3, and as to Count 5, 120 months to run concurrently to counts 1, 2, and 3, and as to Count 4, 60 months to run consecutively for a total term of 295 months. (DKT 132, p 2).` The judgment was issued on November 7, 2014, and Davis noted a timely Notice of Appeal on November 12, 2013.( ECF No. 132, 135).

On October 21, 2015, pursuant to Fourth Circuit Court Order, (Appl Dkt No.48), the District Court certified the Davis trial transcripts as accurate and complete, and on November 4, 2015, said court certified his sentencing transcripts as accurate and complete. (ECF No. 204, 206).

On July 22, 2015, the ORDER REGARDING MOTION FOR SENTENCE REDUCTION PURUANT TO 18 U.S.C. § 382(c )(2) was granted reducing Davis's sentence to 248 months, effective as of 11/01/2015.(ECF No. 201).

## STATEMENT OF FACT

The government charged the defendant and four co-defendants in a five count indictment with conspiracies to obstruct and affect commerce by robbery and the unlawful taking of narcotics and narcotic proceeds, to conspire to distribute and to possess with intent to distribute five kilograms or more of a mixture of cocaine, to conspire to possess firearms in furtherance of the afore-stated conspiracies, as well as the possession of a firearm. In addition, Davis was charged with the unlawful and knowing possession of said firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year.

Davis was arrested as a result of a government sting operation. The government's case consisted of the testimony of two confidential informants and a co-defendant, said testimonies in large part corroborated by sound and video recordings, and Davis's mirandized confession.

The facts followed the typical pattern of a government sting of urban gangs.

The testimony of the two informants and co-defendant Johnson was substantially corroborated by audio recordings of their meetings, telephone calls and the audio/video recording of the conspirators in a van provided them by the government for use in the fictitious robbery. After his arrest, Davis provided a mirandized statement acknowledging his participation in the conspiracy absent the use of a handgun.

4

In November 2012, B.S., a confidential informant, a long time drug dealer with an extensive criminal history, and a member of a branch of the Black Guerrilla Family, [BGF], located in Baltimore City, informed the government about the activities of BGF, detailing how it worked, its membership, and its current plans to engage in kidnapping and robbery.T-11-163-65, 166-171).. One of the persons B.S. discussed was Davis. T-11-169-171).. In December 2012, Davis and he were officers in the same BGF bubble, i.e., a local chapter/branch of BGF. B.S. informed the government that his particular group was involved in kidnappings, robberies, and drug trafficking, and that it was currently planning to kidnap for ransom Little Twan, the son of a successful heroin dealer, Antoine Knight aka Crooked Face Twan, and that it was also planning the robbery-murder of Big Sam, another drug dealer with whom the gang had a dispute. (T-11-171-180). The government, in concert with confidential informants B.S. and A.M., a confidential informant unknown to the gang, created a sting operation. (T-11-183-186)). DEA had A.M. provide a van equipped with sound and video monitoring, and a kill switch that could turn off the vehicle's engine remotely. The informants were to entice Davis and other BGF members to participate in a robbery conspiracy of 10 kilos of cocaine from A.M.'s drug supplier. (T-1-79-84)

B.S. testified that Davis was the group's commander and leader, and that he (B.S.) was the group's Minister of Defense (MOD). (T-11-166-168) B.S. testified

they both participated in the meetings where the plans to execute the aforementioned enterprises were authorized. (T-11-174).

He proposed the plan to Davis because BGF protocol required Davis's authorization of its various criminal enterprises. (T-11-181) . B.S. informed the jury that Davis was enthusiastic about the plan. (T-11-181-183)

Acting upon B.S.'s suggestion, Davis and he put a "team together." ( T-11-181).

On December 12, 2012, B.S. introduced the team members to confidential informant A.M., who proposed the robbery of his supplier's 6-10 kilos of pure cocaine on condition that he and BGF would split the proceeds 50-50. (T-11-190-97, 203-209). When A.M. informed Davis and his associates that they would have to have guns, co-defendant Proctor replied that would not be a problem, while Davis stated they would also need a vehicle. (T-11-196, 212-213). At no time did anyone suggest that they not proceed with the robbery. (T-11-212-213). B.S. went on to testify that after A.M. left, Davis stated the need to kill A.M. to prevent his possibly revealing their identities. (T-11-214-218).

On December 19th A.M. met with the defendants and recorded their conversation. On December 20th., B.S. used the Government's wired vehicle to picked  (T-11-229). Davis informed B.S. that he had arranged to take the vehicle to a chop shop after the robbery. (T-11_241). After the police removed B.S. from the

6

conspirators by conducting a fake arrest, Davis took possession of the government's van and keys, and was its driver when everyone was arrested. (T 241-242).

Davis's co-defendant, Michael Johnson, testified that he was one of the group's "Bush Members", i.e., elder statesmen of the gang", with the title of Gatekeeper. During the course of their projected robbery, he had met with all the co-defendants, including Davis, and "the guy that's suppose to be setting up everything [A.M. aka"Big Boy"]." (T-11-348)  During their first meeting , the conspirators were advised guns were a necessity. T-11-348).  Johnson testified that Davis participated in the group's meetings and never expressed reservations as to the group's plans to use firearms. (T-11-349).

He testified that B.S. spoke to him about their killing A.M. because Davis didn't trust A.M. ( T-11-350). On the day of the robbery, co-defendant Proctor (AKA Hot Rod), was in the front passenger seat. (T-11-364-365) . During their ride to meet A.M. everyone discussed their plans to rob A.M. (T-11-361). Davis told the group he would join them when the robbery took place. (T-11-370).

After he was arrested, Davis stated he wanted to cooperate with the authorities.  After being mirandized, he informed the authorities that he and his co-defendants had agreed to participate in the robbery of A.M.'s supplier after they were informed that the supplier "..would have at least ten birds..[kilos]", and,

7

subsequently it was agreed that Davis would be the driver, B.S. and Proctor would bring the firearms, and Proctor would shoot anyone who tried to shoot them. (T-111-423-430).

During his opening statement and closing argument, Davis's counsel argued that while his client did not possess a handgun, the case was "unique" in that he agreed with the government "[t]hat the crimes charged in the indictment and the facts that they were based upon did, in fact, occur." (T-1V-494). "If you recall, what I said to you [in opening argument] ..that this is not a question where there is an issue whether they [the government] had the wrong person …" *Id*. "What's peculiar about this case from – and the judge is going to tell you the law about something called entrapment: That's been the only issue in this case from its inception: That's been the only thing that I attempted to elicit testimony about, and was whether or not the facts would indicate to you whether or not Mr. Davis was entrapped by the Government in committing this offense."( T-1V-495). "[T]he issue is whether or not the Government entrapped him." (T-1V-495-496).

Davis through his counsel also took issue with the Government's statement that he (Davis) was incarcerated 16 years, informing the jury his client had been paroled after serving 10 years of said sentence. *Id*.

In his rebuttal, the prosecution acknowledged that he had been incorrect, that Davis had been sentenced "… to 16 years in prison for attempted first degree

murder, use of a firearm, and Mr. Tuminelli said second-degree assault. He [Tuminelli] makes mistakes, too. First –degree assault, two counts. The criminal records and convictions are—in evidence. You can read them yourself… Two counts first-degree assault, one count attempted first-degree murder. One count use of a firearm in a drug trafficking crime. Predisposition evidence? Maybe, maybe not." (T-1V510).

" I didn't mean to suggest—if I did so, I will apologize to Mr. Tuminelli. I did not mean to suggest that Mr. Davis was part of the plan to kidnap Mr. Hollman. He was on the box, Mr. Tuminelli was talking about. He was on the box at the time that incident happened, I think.

But, when he assumed responsibility for the same bubble—that's what B.S. said—as commander, they were going to do it again--they, the BGF, but this time Mr. Davis. Why take it seriously? It happened once before. Same group. Not this defendant. Same group of BGF members, in the same bubble. Opportunity to commit a crime? Predisposition to commit crime? That's pretty good to me." (T-1V-510).

"And, later: Prior robberies of drug dealers, like Fat Sam, prior attempted kidnapping of Cooked Face Twan's child, when you take into account the fact that it happened with the same group of individuals, same bubble—not the Defendant—same bubble. I didn't mean to suggest otherwise. (T-1V-511-512).

9

"Mr. Davis' statements—and I'm not trying to paint Mr. Davis as the bad person or that he was involved in that particular robbery, or –excuse me—kidnapping. Lost my train of thought now.

That was done to point out to you that this was something to be taken seriously—seriously by law enforcement, seriously ---and seriously to take the actions that were taken, to do the things that were done. We don't apologize for it. We embrace it. We did our job that day. These guys went out, for lack of a better term, they may have saved a four-year old's life." JA 518.

## <u>SUMMARY OF ARGUMENT</u>

This brief is submitted pursuant to *Anders v. California*, 368 U.S. 738 (1967). Counsel brings four issues to the attention of the Court: (1) Did the District Court's certification of the trial transcripts without reference to the court reporter's backup tapes result in a violation of Davis's Fifth Amendment Due Process Right to a complete transcript; (2) Did the government engage in "outrageous conduct"; (3) Was the admission of Davis's prior 404(b) convictions an abuse of discretion; and (4) Was there sufficient evidence to sustain Davis's possession of a firearm

# ARGUMENT

**I. WAS THE DISTRICT COURT'S CERTIFICATION OF THE TRIAL TRANSCRIPTS WITHOUT REFERENCE TO THE COURT REPORTER'S BACKUP TAPES AN ABUSE OF DISCRETION DENYING DAVIS HIS FIFTH AMENDMENT RIGHT OF DUE PROCESS**

### A. <u>Standard of Review</u>

**Was the court's restricting its determination of the accuracy of the trial transcripts without comparing them to the court reporter's backup tapes to confirm whether Davis had informed it he sought new counsel because he did not have sufficient time to review discovery and prepare for trial an abuse of discretion.**

### B. <u>Argument</u>

On November 3, 2014, the Fourth Circuit issued Order,(Frth.Cir. Dkt # 48), remanding the captioned case to the District Court for the purpose requiring said court pursuant to FRAP 10( c) & (e ) and Fourth Circuit Local Rule 10(d) to determine the accuracy of the transcripts, correcting them where necessary for the purpose of certifying the trial and sentencing transcripts as complete and accurate. Id.

Pursuant to said Order, a hearing was conducted May 28, 2015. Testifying were Davis, Martin Giordano, court stenographer, and Arcangelo Tuminelli, defense counsel.

Davis testified that omissions from his transcripts were:

- Day one, prior to opening statements when he requested new counsel because he had not been provided the opportunity to examine discovery and prepare for trial

- Day four, when his attorney objected to the Court's instruction clarifying the law of entrapment

- A portion of his allocution at time of sentencing.

(Trans., 05/28/2015, pp. 6-9, 10, 12-23).

Giordano (court reporter) testified that he had not provided the court's instructions to the jury in the first set of transcripts because they had not been requested by appellate counsel, and the current transcripts included all the jury instructions including trial counsel's discussion with the Court respecting its instruction clarifying the law of entrapment; and, further that he had twice

reviewed the transcripts as well as the recordings of the trial and sentencing, and the transcripts as now provided were complete. (Trans., 05/28/2015 pp. 24-26, 28-29). (In fact, appellate counsel had in his initial request specifically requested the jury instructions, which absent the court's discussion with trial counsel respecting the jury's requested instruction to clarify the law of entrapment, had been provided. (ECF NO. 150; ECF No.164, Jury instruction absent clarifying instruction pp. 437-486 ).

Tuminelli (defense attorney) testified that while he could not recall fully what occurred the first day of trial, his rereading the transcripts confirmed on day four, he had not objected to the clarifying instruction respecting the law of entrapment, and that his prior experience with Mr. Giordano was that he was thorough and accurate.

Subsequently, appellate counsel filed Memorandum, ECF No. 197), noting that the initial request for jury instructions had been filed, that said jury instructions absent the court's clarifying instruction had been included in the initial

13

transcripts, and renewing the request for review of the court's back-up tapes. (ECF No. 197, exhibit 197-3).

The Government replied that the omissions cited by Appellate, "do not make the transcript indecipherable or incapable of providing a suitable record for review." "More importantly, the omissions even if made, do not warrant a new trial." (ECF No. 200).

Government further noted Mr. Giordano was known to the Court and counsel [Trial & Appellate], has worked extensively with the court, "has no incentive to mis-transcribe any proceeding, nor testify falsely if he did." (ECF No. 200). He further stated that Mr. Giordano testified about his reviewing "the transcript and his back-up tapes, as requested, twice, and found no material differences." ID.

The Court's Order found that while

> "[D]avis had cited discrete areas of the trial transcript that he believed are inaccurate, he has not shown that there is a reason to distrust the accuracy of the transcripts as they relate to the two instances at trial." ECF, No. 204, at 9. "Mr. Giordano testified that he reviewed his back-up tapes twice, and there are no discrepancies in the transcripts. Given the Court's experience with Mr. Giordano and his testimony and demeanor at the evidentiary hearing, the Court credits his testimony."( ECF No. 204, p. 9).

14

Respecting "inconsistencies" in the testimony, the Court found:

> "At most, the evidence shows a misunderstanding between Mr.
> Cheslock and Mr. Giordano over what was to be included in the
> transcripts, which Mr. Giordano immediately corrected. There is
> nothing in the evidence causing the Court to question the contents of
> Mr. Giordano's prepared transcripts."( ECF No. 204, at 9 n. 8).

In Appellate memorandum (ECF No. 205), counsel adopted by reference

arguments and objections as stated in ( ECF No. 197 and 203), requesting review

of back-up tapes of day one of the trial respecting Davis's testimony and Davis's

sentencing allocution, and noted the loss of the Court's clarifying instruction to the

jury in reply to its request for clarification of the law of entrapment. In its Order,

the Court states:

> "Although Mr. Tuminelli does not remember his exchange with Davis
> at the beginning of the trial, he believes that the transcript is correct.
> Even if the Court were to ignore Mr. Tuminelli's testimony on the
> events surrounding the "counsel issue" because of Mr. Tuminelli's
> lack of memory, the only evidence presented by Davis is his own
> firmly held belief that he asked the Court for new counsel. Mr.
> Giordano has reviewed his backup tapes and testified that such
> conversation with the Court never occurred. Based on Mr. Giordano's
> testimony and the Court's recollection of events, the Court believes
> that the government is correct in asserting that Davis has confused his
> off-the-record conversation with Mr. Tuminelli with what occurred in
> open court. Despite Davis's testimony, the Court finds that the trial
> transcripts were accurate." (ECF No. 204 at 10-11).

The Court denied Davis's fourth motion request to refer to the

stenographer's backup tapes as they related to alleged errors in the trial transcripts,

15

and certified them as accurate and complete. It granted Davis's request as it related "to the request for the Court Reporter's backup tapes for Davis's allocution on November 6, 2013." ( ECF No. 204 at 11-12).

Subsequently, appellate counsel filed a memorandum for modification to said Order and permitting a review of the trial transcripts.(ECF. 206, p. 109-11). The Court's Order denied said Motion observing the basis were issues previously presented and that under Federal Rules of Criminal Procedure, unlike Federal Rules of Civil Procedure, "the Federal Rules of Criminal Procedure do not provide for reconsideration in criminal cases." (ECF No. 206).  The Court Order stated that the Court having reviewed the sentencing backup tapes  and comparing them to the official sentencing transcript, said transcript "reflects the content of the back-up recording without any material alterations."(ECF No. 206 at 6). "The Court certifies the transcripts for Davis's sentencing and allocution on November 6, 2013 are accurate and complete;"

Davis's motion for modification was denied. (ECF No. 206, p. 7)

THE MISSING JURY INSTRUCTION

The Court was unable to locate the jury instruction clarifying the law of entrapment.

Pursuant to the Jury's request for clarification of the law of entrapment, "The Court informed the parties that it was sending the following answer back:

16

' Dear jury, the defense of entrapment requires all three of the conditions in the first –All three of the numbered conditions in the first paragraph on page 76." ECF. No.174 at 113, ECF No 204 at 5.  In the footnote to page 5 of said Order, the Court stated: "The paper containing the Court's answer to the jury was shredded and never filed on the docket." The footnote continued that in a reply to Appellant counsel's inquiry, the "Court informed him that Court 'recalls that the note – rewritten to remove cross-outs and unclear words—was given to the jury and read: 'Dear Jury, the defense of entrapment requires all three of the conditions in the first –all three of the numbered conditions in the first paragraph on page 76. ( ECF No 197-1 at 6)"

At the May 28, 2015 hearing, trial counsel testified that after he read the transcript,: "…[I] recall—and, again it was reinforced when I looked at the transcript—he [the Court] was not going to submit the answer that I had –or the language I had asked for. …..and I think I even said to the Court, [as stated in the transcript] OKAY … [He stated]  That's what my recollection is reading that, and was that I had asked for it; the Court thought that it was covered; and I accepted the Court's ruling." (ECF No. 194 at 33, 34).

Federal Rules of Appellate Procedure 10(e) Correction or Modification of the Record state:

(1) If any difference arises about whether the record truly discloses what occurred in the district court, the difference must be submitted to and settled by that court and the record conformed accordingly.

(2) If anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected and a supplemental record may be certified and forwarded:

(A)   On stipulation of the parties;

(B)   By the district court before or after the record has been forwarded; or

(C)    By the court of appeals.

(3) All other questions as to the form and content of the record must be presented to the court of appeals.

Under FRAP 10, the district court's review is to ascertain the accuracy of the record, and if there are omission(s), if possible, to correct and a supplemental record certified either by stipulation of the parties or by the district court.

*In Hardy v. U.S., 375 U.S. 277,* the Supreme Court held that counsel could only discharge the obligation which the court has placed upon him if he were allowed to read the entire transcript. *Hardy v. United States, 375 U.S. 277, 280.* "The right to notice ''plain error or defects' is illusory if no transcript is available at least to one whose lawyer on appeal enters the case after the trial is ended." *Id.* An attorney's responsibility was "not to serve as amicus to the Court of Appeals, but as an advocate for the appellant." *Id.* The Court concluded "that this counsel's duty cannot be discharged unless he has a transcript of the testimony and evidence presented by the defendant and also the court's charge to the jury, as well as the testimony and evidence presented by the prosecution."*Id*.

18

In their concurring opinion, Justices Goldberg and Clark stated: "As any effective appellate advocate will attest, the most basic and fundamental tool of his profession is the complete trial transcripts." …"Anything short of a complete transcript is incompatible with effective appellate advocacy." *Hardy, 375 U.S. at 288.* "[N]o responsible retained lawyer who represented a defendant at trial will rely exclusively on his memory (even as supplemented by trial notes) in composing a list of possible trial errors which delimit his appeal … An appointed lawyer, whether or not he represented the defendant at trial, needs a complete trial transcript to discharge his full responsibility of preparing the memorandum supporting the application to proceed in forma pauperis.*" Id* .

In *United States v. Huggins,* 191 F.3d 532, (4th Cir. 1999), the defendant alleged that the trial transcripts "contain[ed] so many omissions and inaccuracies that ...appellate counsel cannot perfect his appeal and a new trial is warranted." *Huggins,* 191 F.3d at 535. The Fourth Circuit, citing *Hardy,* 375 U.S. at 279, held that a defendant has the right to an appeal "based on a complete transcript." *Huggins,* 191 F.3d at 536.  The *Huggins* court held that when an omission exists, the appellate court must determine if said "omissions or deficiencies justify a new trial."*Huggins. Id. Huggins* reaffirmed *United States v Gillis*, that to warrant a new trial, "[a]n appellant must demonstrate that the alleged omissions 'specifically prejudices his appeal…'"

In *Huggins*, the appellate court held the errors did "not rise to the level of specific prejudice." The errors did not prevent the court "from reviewing the district court's ruling[s]…" The Huggins District court had conducted a hearing, and pursuant to FRAP R.10 (e) "supplemented the transcript with copies of documents and trial notes retained by the court." *Id*. The Appellate Court concluded its review of the defendant's transcripts stating: "After carefully reviewing the record, it appears that the inaccuracies and omissions in the transcript were not substantial in amount and did not occur at particularly significant periods during the trial. In summary, they did not specifically prejudice Huggins to identify issues for appeal." *Huggins,* 191 F.3d at 538.

In *United States v. Pace,* 10 F.3d 1106 (5th Cir. 1992) *t*he issue was the trial court's certifying a lost jury instruction it sent to a deadlocked jury requesting clarification of 18 U.S.C. § 924 (c ). The Court had instructed it verbally. *United States v. Pace,* 10 F.3d at 1122. The Court stenographer could not locate the transcript. *Id*.  It did remember that it was a "pattern Allen charge", and it supplemented the record and certified it as such. *Id*. Appellate counsel objected as it was created "solely from the recollections of the trial court and did not include any objections that may have been made by trial counsel." Pace, 10 F.3d at 1122-23.  The issue was remanded back to the district court that supplemented the record stating it "believed" that defense counsel objected as they usually do object to an

20

Allen Charge. Id. While the Fifth Circuit held the loss constituted "a substantial and significant portion of the trial record", it observed neither the Court reporter, his trial counsel nor the jury foreman indicated the trial judge may have deviated from the written modified Allen charge." *Pace*, 10 F.3d at 1125. It held "the record of the loss of a pattern jury instruction, faithfully read, is simply easier to reconstruct… [and the judgment was affirmed] *Pace, 10 F.3d at 1123, 25)* .

Davis requested the backup audio tapes very specifically to use to determine if there were omissions and to reconstruct the transcripts if necessary.

I*n Smith v. United States District Court Officers, 203 F.3d 440, (7th. Cir. 2000)*, a criminal case, the defendant sought copies of audiotapes "of all the proceedings in his case, claiming that the transcripts were inaccurate." *Smith v United States,* 203 F.3d at 441.

The appellate court observed that the issue presented it with "[a] question on which we cannot find any case law - is whether, or more precisely when, audio tapes of a judicial proceeding should be deemed judicial records within the meaning of the access rule." *Id*. The appellate court observed that *27 U.S.C. §753* offered it assistance. *Id*. "It requires that proceedings in open court be recorded verbatim, but permits the recording to be done by any reliable method, including taping; and it also requires the reporter to file the 'original records' in open court." *Id.* "It follows that if an audiotape is the only record made of a proceeding, it must be filed with the court." *Id*. The *Smith* Court noted that pursuant to the *Judicial*

*Conference of the United States* , *6 Guide to Judiciary Policies and Procedures §*

*16.4.4 (Court Reporting Manual), Jan 1998)* one of the tapes in question was an

original record. A transcript had been made from the tape and filed with the court.

However, the transcript was not the original, the tape was, and the tape was to be

provided to Smith. In its decision, the court distinguished the aforementioned tape,

to which it said Smith should have access from "backup" tapes. *Smith v. United*

*States 203 F.3d at 442*.

The *Smith Court* held that the regulations as stated by the *Judicial*

*Conference of the United States,*[*Court Reporters Manual ["CRM"]:*

> "make these [the stenographer's back up tapes] the personal
> property of the reporter except as to audiotapes of arraignments,
> changes of plea, and sentencing hearings. *6 Guide to Judiciary*
> *Policies and Procedures, supra, sec. sec. 16.4.1, 16.4.4* . We do not
> think that these should be deemed judicial records, ***unless some***
> ***reason is shown to distrust the accuracy of the stenographic***
> ***transcript.*** **(**Emphasis added**.)** *Smith v. United States Dist. Court*
> *Officers,* 203 F.3d  at 442.

## II.    WERE THE GOVERNMENT ACTIONS OUTRAGEOUS AND IN VIOLATION OF DUE PROCESS?

### A. <u>Standard of Review</u>

When an entrapment defense is submitted to a jury, an appellate court may

overturn [a guilty finding] only if no rational trier of fact could have found

predisposition beyond a reasonable doubt." *United States v. Jones*, 976 F. 2d

176, 180 (4th Cir. 1992).

22

### B. **Argument**

In the case of *Hampton v. the United States,* 425 U.S. 484, 96 S. Ct. 1646 (1976), the defendant's testimony was in conflict with that of Hutton's, the government informant.

Hutton testified that after Hampton observed needle marks on his arms, he informed Hutton that he could supply him with heroin. Hutton then introduced Hampton to an undercover DEA agent who effected two purchases of heroin from the Hampton. *Hampton v. United States,* 425 U.S. 484, 85-86; 96 S. Ct. 1646, 48 L. Ed. 2d 113 (1976)

Hampton's testimony was that after he told Hutton he needed money, Hutton told him that he could supply him fake heroin manufactured by a pharmacist friend, and that it was Hutton's idea to sell the fake drug to unknowledgeable persons that  Hutton knew. *Hampton,* 425 U.S.at 487.  The appellant acknowledged that he initially approached the informant after he had observed his needle marks, and further acknowledged his selling the drugs supplied by Hutton to a person to whom Hutton had introduced him. Hampton testified that the only heroin sold had been supplied by the government, and that the persons he sold it to were a government agent and a second party introduced to him by the government's confidential informant.  *Id.* He denied knowing the drugs were heroin and his otherwise selling the heroin to anyone the informant had not

23

introduced to him. Hampton had requested the district court to instruct the jury that irrespective of his predisposition to sell drugs, public policy required a not guilty finding because of the government's outrageous behavior and his being entrapped by the government in the performance of the crime. *Id*.  He cited *United States v. Russell,* 411 U.S. 423 (1973) that: "we may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction*, cf. Rochlin v. California,* 347 U.S. 165 (1952)…"411 U.S. at 431-432*. United States v. Hampton,* 425 U.S. at 489.

The Supreme Court ruled that while the Government's informant may have supplied the illegal drug that was "the *corpus delicti* for the sale of which the petitioner was convicted",  the issue was his predisposition to commit the crime. *Id.*

 "The limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity violates some protected right of the defendant." *United States v Hampton* 425 U.S. at 490.

As with the case before this Court, in *Hampton*, "the police, the Government Informant[s] and the defendant acted in concert with one another." <u>*Id*</u>. In *Hampton*, the issue was the appellant's predisposition to commit a crime, and the Court's decision that assuming his rendition of events was correct, his acknowledged

24

predisposition to commit the crime precluded a jury instruction that the jury acquit him because of the involvement of the government and its agent(s). *Hampton*, 425 U.S. at 489-90.   With Davis, and over the government's objection, the Court granted the defendant's requested entrapment instruction.

A majority of the *Hampton* Court held that Supreme Court precedent did not preclude a judge's dismissal of an indictment where the government's conduct "…is sufficiently offensive, even though the individual's entitled to invoke such a defense might be 'predisposed.'" Dissent, Mr. Justice Brennan, Mr. Justice Stewart and Mr. Justice Marshall, concur; *Hampton v. United States*, 425 U.S. at 497; Justice Powell, with whom Justice Blackmun joined, concurring in the judgment, but holding that precedent did not preclude a dismissal when a court is confronted with "outrageous police conduct."*Hampton v United States*, 425 U.S. at 493.

As stated in *United States v. Hasan*, 718 F.3d 338 (4th Cir. 338 2013), after *Hampton*, "outrageous conduct" survives in theory, but is highly circumscribed." *United States v. Hasan*, 718 F.3d at 343. The Fourth Circuit referred to its earlier discussions of outrageous conduct in *United States v. Goodwin*, 854 F.2d 33 (4th Cir. 1988) and *United States v. Osborne*, 935 F. 2d 32 (4th Cir. 1991). In the latter case, the defendant had requested dismissal of his indictment because he alleged "outrageous conduct violative of his rights to due process of law." *Osborne* 935 F.2d at  35-36 (Osborne, the *Hasan* Court noted, had "cited with approval several

25

cases, including *United States v Simpson*, 813 F.2d 1462 (9th Cir. 1987). Defendant Osborne, had relied on *United States v. Luttrell*, 889 F.2d 813 (9th Cir. 1989) which held, contrary to the Fourth Circuit, that "constitutional norms", required that the government have "reasoned grounds" when it "approach[ed] apparently innocent individuals…" and provided them the opportunity "to engage in criminal conduct." *Osborne,* 935 F.2d at 35*.* (Subsequent to the *Osborne* decision, the Ninth Circuit, sitting en banc, vacated its earlier holding in *United States v. Luttrell,* 923 F.2d 764 wherein it explicitly rejected its prior decision that the government must have "reasoned grounds to investigate a particular individual." *United States v. Luttrell*, 923 F.2d 764 (9th Cir. 1991.), The *Lutrell Court,* like *Osborne,* cited *United States v. Jenrette,* 744 F. 2d 817, 824 (240 U.S. App. D.C. 193 (D.C. Cir.) cert. denied, which held "'no constitutional violation where F.B.I. targeted a defendant without 'reasonable suspicion' of wrongdoing."), , 471 U.S. 1099, 105 S. Ct. 2321 (1984) (Additional Circuit Court decisions cited by *Luttrell* are here omitted.).

Discussing *Osborne's* argument that his case entailed a Due Process violation, the Fourth Circuit Court cited *United States v. Jacobson,* 916 F.2d. 467 (8th Cir. 1990*)* which held that the government's conduct had not constituted "a due process violation [as it was not] so outrageous as to shock the conscience of the court." (*Jacobson citing Rochlin v. California,* 342 U.S. 165, 172 (1952), *United States v. Jacobson,* 916 F 2d. 467.

26

In its discussion of the 8th Circuit's *Jacobson* decision upholding Jacobson's conviction, the Fourth Circuit observed that Jacobson had been found guilty of receiving child pornography through the mails despite the government's repeated attempts over a long period of time to solicit his purchasing illegal child pornography which that court held "not [to] rise to the level of outrageousness necessary to constitute a due process violation." *Osborne*, 935 F.2d at 36 citing *Jacobson*, 916 F.2d at 470. The Eighth Circuit's "conscience", [in Jacobson], the *Osborne* Court noted, remained undisturbed…" by the government's targeting Jacobson in five sting operations until he "finally ordered material depicting minors."*Osborne*, 935 F.2d at 37.

While the Supreme Court reversed *Jacobson, Jacobson v. United States,* 503 U.S. 546 (1992) because of the Government's conduct, its decision has no impact on the case before this Court because of their dissimilar factual situations. In Davis, B.S.'s testimony was that prior to his being approached, Davis had suggested to him their robbing his supplier. (T-11-182-183) "[W]hen I told him about it [robbing B.S.' supplier's supplier], he like, "Man, I been asking you for somebody to do that to anyway as far as on your side,"…"(T-11-182).  After he was arrested and mirandized, Davis stated he and his co-conspirators had decided as a group "to take the offer from the fat dude [A.M.)." (T-111-427-29). The Supreme Court reversed Jacobson's conviction because of the government's

outrageous behavior. Jacobson had testified that he had not known the material he ordered was pornography and the Government had actively pursued Jacobson over a two year period and, at times, suggested that his illegal conduct was appropriate.

While the Supreme Court held the Government's conduct in *Jacobson* was inappropriate, it further held: "[T]here can be no dispute that the Government may use undercover agents to enforce the law. It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Jacobson, 503 US. at 548 quoting Sorrells v. United States,* 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932)*, Sherman,* 356 U.S. at 372, 78 S. Ct. at 820, *United States v. Russell,* 411 U.S. 423, 435-436, 93 S.Ct. 1637, 1644-1645, 36 L. Ed. 2d 366 (1973). *n , supa* 356 U. S. at 372,78 S. Ct. at 820. The issue was Jacobson's lack of predisposition and the government's entrapment of an innocent party. The fact believed significant in *Osborne* that no government agent had personally solicited the illegal actions was an issue not even addressed by the Supreme Court's *Jacobson* decision. Rather, its concern was that the government targeted Jacobson over a period "of 26 months of repeated mailings…" Therefore, although he [Jacobson] had become predisposed to break the law…it is our view that the government did not prove that this predisposition was independent and not the

28

product of the attention that the Government had directed at the petitioner..." *Jacobson,* 503 US. at 551 , *Sorrells, supra* 287 U.S. at 442, 53 S. Ct. at 213*; Sherman, supra* 356 U.S. at 372, 78 S. Ct. at 820.

More recently In *United States v. McLaurin* , 764 F.3d 372 (4th Cir. 2014) wherein the government employed a reverse sting operation to curtail a fictitious home invasion of a stash house, the Fourth Circuit reviewed the basic issues relating to the law of entrapment. After a confidential informant, arranged to have McLaurin sell an undercover police officer, Ortiz-Trinidad, (OT), a handgun and a sawed-off shotgun, the defendant was introduced to two undercover ATF agents posing as disgruntled drug couriers. McLaurin was informed they were looking for people who might be interested in robbing their employer's stash house and that the house usually contained between seven to nine kilograms of cocaine. McLaurin's reply was that he was not only interested in performing the robbery, but because he had recently sold his firearms, he would have to acquire new guns and recruit assistants. He informed the agents that he had performed similar robberies in the past. *United States v. McLaurin,* 764 F. 3d at 376. On occasion, the agents stressed the robbery would be dangerous and that McLaurin need not go through with the robbery. McLaurin subesquently recruited Lowery. On the day of the planned robbery, McLaurin and Lowery were arrested at the fictitious storehouse. Neither party had firearms, and McLaurin's statement was that rather

29

than commit a robbery, he, in fact, had planned to ask the cartel to front him the drugs. *McLaurin, 764 F.3d at 378.,* The Fourth circuit held that "Entrapment is an affirmative defense consisting of "two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in criminal conduct*."Mclaurin,* 764 F3d at 379. *Citing Mathews v. United States,* 485 58, 63, 108 S. Ct. 883 (1998), and that the District Court's instruction that while a person with "no previous intent or purpose to violate the law but is induced by law enforcement officers or agents to commit a crime" the party is a victim of entrapment. *Id*. However, where a person already has the readiness and willingness to break the law the fact that government agents provided him a favorable opportunity is not entrapment. *Id*.

If the evidence provides a reasonable doubt whether the defendant had the previous intent or purpose to commit the offense of the character charged, then the jury should find the defendant not guilty. *Mclaurin,* 764 F.3d at 379  See *United States v. Hasan,* 718 F.3d 338, 490 (4th Cir. 2013), *United States v. Parker,* 2015 U.S. Dist. Lexis 71727 at 49-50, ( the government's conduct was not "outrageous'' where the government initiated contact with the defendants, committed the crime, and helped the defendants transport the fruit of the criminal enterprise across state lines.)

In the case before this Court, the government's targeting Davis was neither random, nor its success the result of a prolonged, multifaceted effort. It was the result of information provided by a close business associate of Davis, both parties holding executive positions in the same chapter (bubble) of the Black Guerilla Family, an organization whose former officers had very recently been found guilty of committing the same types of crimes Davis's associate claimed it was continuing to engage in.

"Artifice and stratagem maybe employed to catch those engaged in criminal enterprises." Id. (citations omitted.). It is however '"unconscionable [and] contrary to public policy, and to the established law of the land to punish a man for the commission of an offense of the like of which he had never been found guilty of if the officers of the law had not inspired, incited, persuaded, and lured him to attempt to commit it.'" *Sorrells,* 287 U.S. at 442 *quoting Butts v. United States,* 273 F, 35, 38 (8th Cir.). While a person's "predisposition and criminal design are relevant", it is no defense to the claim of entrapment for the government to claim either that a defendant has "a bad reputation or had previously transgressed…" *Sorrells,* 287 U.S. at 451, 459.

In both *Sorrells* and *Sherman,* the defendants initially rebuffed government agents' urgings that they break the law. In neither case, did the respective target of the investigation "evince a 'ready compliance' to accede to [the government's

31

requests]." *Sherman v. United States,* 356 U.S. at 375, 78 S. Ct. 819*; Sorrells v. U.S. 287 U.S. at 440.*

## III.  WAS THE COURT'S ADMISSION OF 404(b) EVIDENCE AN ABUSE OF DISCRETION

### A. <u>Standard of Review</u>

Davis had objected to government's introduction of his criminal record. When the party preserves his objection to the introduction to 404(b) evidence, "the court's decision is reviewed for abuse of discretion, subject to harmless error analysis." *United States v Cervantes, 706 F.3d 603, 615 (4ᵗʰ Cir. 615) citing United States v. Girod, 646 F.3d 318 (5ᵗʰ Cir. 2011)*

### B. <u>Argument</u>

On July 31, 2013, the government filed: "Government's Motion in Limine To Admit Evidence of the Defendant's Predisposition Pursuant To Rule 404(b). (ECF No.  77-78)

Subsequently, during his opening statement, defense counsel stated that while there was a gun in the defendant's vehicle, "Mr. Davis did not and was not the person that had that…. when they [Davis and his co-defendants] first started out, …**there was one gun**, and Mr. Davis did not and was not the person that had that gun." (T-1- 32).  (Emphasis added)

Defense counsel informed the jury: "There is something extremely peculiar about this case." (T-1- 33). He agreed with the Government that on December 20,

2014, Davis was driving the vehicle stopped by the government, and that he "was driving the automobile with the understanding that they [the co-defendants] were going to commit the fictitious crime, there is no question that Mr. Davis is not disputing that he was there."( T-1-33). "From beginning to end, this scheme was created by the Task Force….from the Drug Enforcement Administration and other agents." *Id*. With the exception of the gun charges, Davis's attorney admitted that this client participated in the crimes before the jury.

"[G]uilty [defense counsel stated] doesn't mean: Did he [Davis] do what happened on December 20th, because there is no dispute about that." The question is : "Those facts, with the law that the Judge gives you, is it a crime that you convict him for?"(T-1- 39).

Prior to trial, the government had sought leave to admit *404(b)* evidence "[o]nce the defendants raise the suggestion of entrapment…",to demonstrate Davis's propensity to commit the crimes he was charged with (ECF No. 78, p. 2). After defense counsel's opening statement, the government requested the Court's ruling on its 404(b) motion because Davis's counsel had put the issue of his client's predisposition before the jury. (T-1- 40-41). The Court ruled that Davis had raised the entrapment defense in its opening argument, the Government's proposed evidence was to demonstrate Davis's predisposition, and that the probative value of the evidence is substantially outweighs by the danger that it will

33

cause unfair prejudice.(ECF No. 91at 919-20. Subsequently, Davis's counsel objected to the Government's introduction of Davis's prior criminal record, arguing that the convictions occurred in 1999 and that the convictions were for attempted first degree murder, first degree assault, and handgun violation, all said charges being dissimilar from his client's current charges. (T-111-. 32-33). The introduction of the convictions were "under Rule 403, …unnecessarily prejudicial." Id.. Davis's attorney further contended that respecting the current charges there was no testimony that Mr. Davis possessed a handgun on the date he was arrested. (T-111-431-434). The government noted that Davis had refused to stipulate to having a prior felony conviction, an element necessary to prove the fifth count, a felon in possession of a handgun. Davis's defense from the trial's inception was his entrapment by the government. Prior to closing arguments, and over the government's objections, the Court submitted an entrapment instruction to the jury. (T-1V -427-432). (T-1V- 462-467). (EFC No. 98, 76-77).

*Rule 404(b)* provides that:"Evidence of other crimes, wrongs, or acts is not admissible to show action in conformity therewith."However, it is admissible as proof of motive, opportunity, intent, preparation plan, …or absence of mistake…" FRE 404(b). In *Queen, United States v. Queen, 132 F.3d 991, 995 (4th Cir. 1997),* the Court stated 404(b) evidence is not admissible as proof of character and "to show conformity therewith.." *Id*. However, it then qualified itself noting "because

34

of the complex and difficult distinction between evidence of character and evidence of…intent or motive, the broad discretion generally given to trial judges in regulating the admissibility of evidence is, under *Rule 404(b),* more restricted. The evidence must be: (1) relevant to something other than character, such as intent; (2) it must be necessary to prove an element of the crime charged, (3)[and] reliable; [and] as required by *Fed. R. Evid. 403*, its probative value must not be substantially outweighed by its prejudicial nature . *United States v. Queen,* 132 F.3d 991, 995 (4th Cir. 1997), *quoting United States v. Rawle,* 845 F. 2d. 1244, 1247 (4th Cir. 1988). *Queen* recognized that while a person's character can result in different actions, this did not disqualify evidence of "earlier specific states of mind from proving a later similar state of mind." *Id.* While neither of the aforementioned two cases dealt with the issues of entrapment, "there is no doubt that proving predisposition is one of the purposes for which bad-act evidence maybe admissible *." Mclaurin,* 764 F.3d at 380.*citing United States v. Cervantes,* 706 F.3d 603, 615 (5th Cir. 2013); *United States v. McLaurin,* 764 F.3d 372, 381 (4th Cir. 2014).*citing United States v. Thomas,* 134 F.3d 975, 980 (9th. Cir. 1998)("For the jury to find predisposition beyond a reasonable doubt, it must consider the defendant's character."). See *United States v. Murzyn,* 631 F.2d 529 n.2 (7th Ci.r 1980) *and United States v. Burkley,* 591 F.2d 903, 921 192 U.S. App. D.C. 294 (D.C.. Cir 1978).

35

There exists a marked difference in the admission of *FRE 404(b)* evidence in cases where a defendant raises the defense of entrapment. While normally evidence of character and propensity are excluded where entrapment is not in issue, a defendant asserting an entrapment defense makes his predisposition and propensity to commit the acts an issue relevant for jury consideration. "If he suffers a disadvantage, he has brought it upon himself by reason of the nature of his defense." *Sorrells v. United States,* 287 U.S. 435, 451; 53 S.Ct. 210 (1932).

But see *United States v. Sanders,* 668 F.3d 1298, 1314 (11th Cir. 2012) which did not involve an entrapment defense, the issue being the age of the conviction. The issue was Sanders's involvement with the transportation of more than four thousand pounds of marijuana, and 153 kilos of cocaine. *Sanders,* 668 F.3d 1305-1306.  Because Sanders pled not guilty, his intent was an issue. The Court ruled that the admission of a 22 year old conviction for the sale of 1.4 grams of marijuana was not of probative value in establishing Sanders's intent to participate in the conspiracy, because of the conviction's age, disparate roles in the crimes, and the different drugs and the quantities involved. *Sanders,* 668 F.3d at 1315. The Court also found the dissimilarities and age of the conviction, diminished any unfair prejudice. *Id.* The *Sanders's* court declined to "create a per se rule of admissibility respecting a conviction's age. *Id.* And, it further found that

36

because of the "abundant evidence admitted at trial" the conviction's admission was harmless error. *Id.*

In *United States v. McLaurin, 764 F.3d 372, (4th Cir. 2014),* the facts are very similar to those before this court. McLaurin was the subject of a sting operation where the fictitious target was a richly endowed drug stash house. McLaurin and his co-defendant Lowery challenged the government's introduction of 404(b) evidence. Lowery challenged a recent conviction for possession of a firearm, while McLaurin challenged a 2003 conviction for common law robbery.

The McLaurin Court noted that *FRE 404(b)* evidence is generally prohibited "to prove the defendant's character and conduct in accordance with his character…" *McLaurin* 764 F3d at 380 . However, when the issue of entrapment arises, proving [defendant's] predisposition is one of the purposes for which bad –act evidence may be admissible." Citing *United States v. Cervantes,* 706 F.3d 603, 615 (5th Cir. 2013); *United States v. Murzyn,* 631 F.2d 525, 529 n. 2 (7th. Cir. 1980),  *United States v. McLaurin,* 764 F.3d at 380. *Citing the holdings in United States v. Burkley,* 591 F.2d 903, 921, 192 U.S. App. D.C. 294 (D.C. Cir. 1978) (Proving predisposition in an entrapment case is not explicitly  mentioned in *Rule 404(b)* as permissible basis for introducing evidence of other crimes, but …it has always been so considered." *Mclaurin* ,764 F.3d at380-81. The focus is on the defendant's state of mind prior to his being approached by the government. *United States v.*

*Osborne,* 935 F.2d 32, 37 (4th Cir. 1991) the issue is whether a defendant was an"unwary innocent" or an "unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *United States v. McLaurin,* 764 F. 3d  381. The defendant's predisposition encompasses a defendant's character and reputation as well as his criminal history. *Id. citing United States v. Hunt,* 749 F.2d 1078, 1082 (4th Cir. 1984) *and United States v. Cervantes,* 706 F.3d 603, 615 (5th Cir. 2013) *(Additional citations here  omitted.) (See United States v. Thomas, 134 F.3d 975 (9th Cir. 1998*)("For the jury to find predisposition beyond a reasonable doubt, it must consider the defendant's character.") When a defendant asserts he was entrapped, they open the gate for the admission of evidence of similar acts that would not normally be admissible. *Id. citing United States v. Duran,* 596 F.3d 1283, 1299 (11th Cir. 2010).  Similarity also takes on a broader definition. While normally evidence of the possession of a firearm might not be admissible in an armed robbery, Lowery's entrapment defense opened the gate to its being admissible to prove the element of his predisposition to conspire with McLaurin to commit armed robbery, particularly as their success as conspirators hinged on their use of a firearm. *United States v. McLaurin,* 764 F.3d at 383. The evidence should be near enough in time to support an inference, and "need not be precisely similar to the crime charged." *United States v. McLaurin,* 382 at 382. *Citing United States v. Bran,* 467 F.3d 179, 200 (2nd Cir. 2006)

38

The McLaurin Court held McLaurin's old conviction as well as Lowery's more recent one were admissible."Where the evidence is probative, the balance under Rule 403 should be struck in favor of admissibility, and should be excluded only sparingly." *United States v. McLaurin,* 764 F,3d at 383 *citing United States v. Lentz,* 5245 F.3d 501, 525 (4th Cir. 2008). *McLaurin* further noted that Lowery had also opened the door to its admission by contending that there was no evidence he had a firearm or conspired to carry or use one in the conspiracy.

While the district court had originally denied the admission of Mclaurin's old common law robbery, it reversed itself when his counsel questioned Mclaurin's having been previously involved in a robbery.

In the current case, defendant's counsel challenged his client's predisposition to use or possess a firearm, in his opening statement and during the trial.. The issue for the jury was whether Davis had conspired and/or aided and abetted in the use and/or possession of a firearm.

Davis's' conviction for use of a firearm was neither recent nor had it been used in a robbery. The question as to its admission had been contested and the issue  was whether the Court's ruling constituted an abuse of discretion.  The Government extensively used evidence of BGF's activities prior to Davis's assuming leadership and without evidence that he participated in them. B.S. testified that Davis assumed leadership of the BGF when its former commander

was arrested for kidnapping.. B.S. testified that after assuming command, Davis proposed kidnapping Little Twan.

However, in closing, Davis's attorney denied there was any evidence that Davis and his associates were involved in the plan formulated by members of the BGF to kidnap for ransom a child fathered by Hollman, a drug dealer. (T-1V-496). Davis's attorney stated: "What's disputed is that Mr. Davis and these individuals had nothing to do with that. That was a prior plan by another man and other individuals to kidnap the child." T-1V-496-97. "He was not part of that group of people. Mr. Wallner [prosecution] told you the police interrupted that plan and arrested those people. They were convicted." (T-1V-497).

The government's reply: " I did not mean to suggest that Mr. Davis was part of the plan to kidnap Mr. Hollman. He was on the box….. He was on the box at the time that incident happened, I think

But when he assumed responsibility for the same bubble-that's what B.S. said-as commander, they were going to do it again-. Why take it seriously? It happened  once before. Same group. Not this defendant…Predisposition to commit crime? That's pretty good to me.' (T-1V-511-12) .

The issue: "predispossesion" or "guilt by association?"

"The government may not attempt to prove a defendant's guilt by showing that he associates with 'unsavory characters.'"*United States v. Singelterry, 646 F.2d*

40

*1014, 1018 (5ᵗʰ Cir. 1981)*was remanded on the issue of guilt by association. Singeltary was not a case where entrapment was an issue,   Subsequently, in the case of *United States v. Polasek, 162 F,3d 878 (5ᵗʰ Cir. 1998)* remanded on the issue of guilt by association, and the issue, again was  not entrapment,  the Court stated that it had never remanded a case on the issue of guilt by association where entrapment was  an issue and the testimony was offered by undercover agents and/or   informers because the "prosecution's proof was found to be overwhelming." *United State v. Polasek, 162 F.3d at 886.*

## IV.   WHETHER THERE WAS SUFFICENT EVIDENCE TO CONVICT DAVIS FOR POSSESSING A HANDGUN

### Argument

Davis contested his possessing a firearm. While no firearm was found on his person at the time of his arrest, one was removed from co-conspirator, Proctor, seated adjacent to him in the right front passenger seat. The uncontested evidence was that gun was manufactured in Connecticut, and tested operable. (T-1-68,70, 102-03).

Arrested, Davis agreed to give the government a statement. After they determined he was not under the influence of drugs,  medication, or alcohol, he was given his Miranda rights, which he waived, and discussed his involvement in the conspiracy. (T-1V- 425-26). DEA-13, (Signed Miranda Rights Form). Davis

41

informed the authorities he wanted to cooperate with them. (T-1V- 426). He related the roles of A.M. and B.S. presenting their plans for the robbery to Davis, Proctor, Johnson, and Thornton, another co-conspirator. (T-1V-427), and their mutual agreement to perform the robbery. (T-1V-.427-, 28). He further stated that everyone agreed B.S. and Proctor would have guns.  Davis was assigned the role of driver. Proctor was seated in the front passenger seat. On the day of the robbery, a friend of Thornton joined the group, and that everyone agreed "if anyone tried to shoot, Proctor would shoot him first." (T-1V- 426-28). During their ride, Davis said Johnson had stated A.M. would have to be killed. (T-1V- 429). Davis stated he (Davis) had jokingly said they could not trust the "fat dude", [A.M.].  Id. Davis stated the conspirators were participating to feed their families. Id. Davis also said, that everyone knew what was happening because they expected to acquire "ten bird of probably cocaine..[from the victim]…" (T-1V- 429).

Certified records placed in evidence confirmed Davis's prior felony conviction. Defense counsel neither objected to the court's instructions respecting conspiracy, nor Aiding and Abetting.

Mr. Davis was charged in Count Three with conspiracy to knowingly possess firearms in furtherance of a crime of violence and drug trafficking crime …conspiracy to violate the Hobbs Act , Count One, and conspiracy to distribute controlled substance as set forth in Count Two…, 18 U.S.C. § 924 (0) Instructions

42

17, & 20, and  Instruction No. 25  advised the jury that the reasonable foreseeable acts …of any member of the conspiracy and in furtherance of the common purpose of the conspiracy are deemed, under the law , to be the acts of all of the members…"

Davis was charged in Count Four, Possession of a firearm, *18 U.S.C. §§ 924(c ) & 2*, and Count 5, having been convicted by imprisonment for a term exceeding one year…possessing a loaded Ruger, 22 caliber semi-automatic handgun.." 18 U.*S.C. §§ 922(g)(1) & 2*.   The Court instructed, in Instruction No. 44, on the law of Aiding and Abetting in as to Counts Four and Five of possession of a firearm , and being in possession of a firearm.

The verdict sheet found Mr. Davis guilty of conspiracy to possess firearms in furtherance of a crime of violence or drug trafficking crime, possession of a firearm in furtherance of a crime of violence or drug trafficking crime, and possession of a firearm after a prior conviction punishable by more than a year in prison.

In *United States v. Saraeum Min, 704 F.3d 314 (4th Cir. 2013)* the facts were similar to Davis in that it involved a sting operation of a fictitious stash house. In *Saraeum,* the evidence was overwhelming that the participants planned the use of firearms. On "the day the robbery was to occur, every defendant, except Phun, who had assembled the conspirators but  who never intended to participate directly in

43

the robbery, drove to a storage facility where after they  transferred their firearms to a van provided by the government, were arrested (Internal quotes omitted). . Phun was arrested the following day.

The Appellate Court held that as members of the conspiracy, "all of the defendants, including Phun, were legally responsible for the possession of firearms, which was a reasonably foreseeable act by the co-conspirators in furtherance of the conspiracy." *United States v Saraeum Min,* 704 F.3d at 324 n. 9.*quoting Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180 (1946). See *United States v. Snow,* 595 Fed. Appx. 223 (4th Cir. 2015)("*…a defendant is liable for his conspirators' reasonably foreseeable possession of firearms in furtherance of the conspiracy.") Saraeum, F.3d 314, 324 n.9; see Pinkerton v. United States,* 328 640, 646-648 (1946)*; United States v. Blackman,* 746 F.3d 137 (4th Cir. 2014) (Blackman, the fence for the stolen merchandise and who was not present at the scene of the robberies,  was privy to pre-robbery discussions and guilty of *18 U.S.C. 924 (c ) & (2*). Using and carrying a firearm during and in relation to crime of violence. *Blackman,* 746 F.3d at 141 *quoting United States v Dinkins,* 691 F.3d 358, 384 (4th Cir. 2012) "The Pinkerton doctrine provides that a defendant is 'liable for substantive offenses committed by co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy." *Id.*

Certified records placed in evidence confirmed Davis's pleading guilty in 1999, and being sentenced to 16 years incarceration. (T- 111-436-37).

Davis had fore-knowledge that a handgun would be used in the conspiracy and. prior to the robbery, hes had arranged to dispose of the vehicle they were using in a chop shop.

The testimony from government informants and the cooperating co-defendant was that the conspirators agreed that firearms would be necessary to successfully effect the robbery. (T-11- 208). Informant and fellow BGF officer B.S. testified that after informant A.M. proposed the robbery of his supplier to Davis and Davis's associated gang members, Davis informed B.S. that he did not trust A.M., and informed him that he would have to be killed after the robbery took place. Transc. Pp. 215-16. Subsequently, B.S. tsetified Davis told him that A.M. had to be killed because their intended victim would realize that he had been set up, and that the only way the conspirators could preserve their anonymity and avoid retribution would be if they killed A.M. (T-11- 215-216).

At the time of Davis's arrest, a loaded firearm was recovered from the waistband of his co-defendant, Johnson, who had been seated adjacent to him (T-11- 333-336). Johnson testified that Davis participated in the planning stages of the robbery and that Davis was aware that a firearm would be used. (T-11- 349). He testified Davis had been driving the vehicle at the time they were arrested. (T-11-

45

356).   He corroborated the testimony of the government's informants that Davis was part of the conspiracy and agreed that to accomplish their goal a handgun was necessary and further, everyone had agreed on robbing the informant, A.M. (T-11-361-62). He testified that while traveling to the intended robbery site, the group learned that Proctor had forgotten his firearm, and that Davis stopped the car to have Proctor retrieve his gun. T-11-362-64).   He further testified that the conspirators discussed with Proctor his role to shoot anyone attempting to harm them. (T-11-365). Enroute, Davis had observed that A.M. likely had a great deal of money on him and intended to follow his associates to the robbery. (T-11-369. 370). Shortly thereafter, the conspirators were arrested.

In *Rosemond v. United States,* 134 S. Ct. 1240 (2014), the defendant was charged with 924(c), the use of a handgun during a crime of violence or drug trafficking…, requiring the imposition of a mandatory-minimum five year sentence. Rosemond disputed the fact that he had a firearm, that he had fore - knowledge of its possession and expected use by his associate, and that its use should be imputed to him.  The jury was instructed, in part, that "it could convict if (1) the defendant knew his cohort used a firearm in the drug trafficking crime and (2) the defendant knowingly and actively participated in the drug trafficking crime."*Rosemond, 134 S.Ct. 1244.* The verdict form failed to indicate whether the

jury found Rosemond either "had used the gun or instead had aided and abetted a confederate's use during the marijuana deal." *Id*.

In the case before this Court, the evidence, including Davis's mirandized statement, showed Davis knew from the conspiracy's inception the conspirators would use a firearm to effect the robbery. In *Rosemond* the parties disagreed as to how "the two requirements- affirmative act and intent- apply in a prosecution for aiding and abetting a § 924 (c) offense.. ." *Rosemond, 134 U.S. at 1245* . The questions arose from the compound nature of the provision.*Id*. The Court noted that a successful prosecution required showing "the use or carriage of a gun [coupled with proof]…of the commission of a predicate (violent or drug trafficking) offense..." *Id. citing Smith v. United States,* 508 U.S. 223, 228, 113 S. Ct. 2050 (1993). The issues it resolved were "When does a person act to further this double barreled crime? And when does he intend to facilitate its commission?" *Id*. Rosemond stated he had no knowledge of the gun's acquisition; did not bring it to the scene of the crime, and did not use it.  1247. The Court affirmed that 924 ( c) is a "combination crime." It punishes the temporal and relational conjunction of two separate acts …" Id.  "[A]n aiding and abetting conviction requires not just an act facilitating one or another element, but also a state of mind extending to the entire crime." *Id* "[T]he intent must go to the specific and entire crime charged." *Id*. "An active participant in a drug transaction has the intent needed to aid and abet

47

a 924 (c ) violation when he knows that one of his confederates will carry a gun." *Rosemond , 134 U.S.at 1249.* A party is guilty when he is with full awareness of the crime's scope. *Id*. "For that to be true, it must be proved that the person had "advance knowledge "that a firearm would be used, i.e. "knowledge that enables him to make the relevant legal (and indeed moral) choice."*Id.* A person "should not expect to hedge his bets, joining in a dangerous criminal scheme but evading its penalties by leaving use of a gun to someone else." *Id*. The person's knowledge of the intended use of the handgun must be at a point when it not "too late for him to reasonably able to act upon it. "*Rosemond*, 134 U.S.at 1251. In *Rosemond*, the district court's instruction was erroneous "because it did not explain that Rosemond required advance knowledge of the firearm's presence."*Id*. The second half of the Rosemond instruction was appropriate. "As we have explained, active participation in a drug sale is sufficient for §924 (c ) liability (even if the conduct does not extend to the firearm), so long as the defendant had prior knowledge of the gun's involvement."*Id.* The court's instruction, however "did not direct the jury to determine when Rosemond obtained the direct knowledge." *Rosemond*, 134 U.S. at 1251-52. In *Rosemond*, the case was remanded.

In Davis, the testimony of the confidential informants, B.S., A.M. and co-defendant Johnson, and corroborated by their recorded conversations, was that Davis was aware of the need for firearms from the conspiracy's conception, that he

approved their use, and, according to Johnson and B.S. Davis had discussed with B.S. the possible need to kill A.M. to protect the group from retribution. On their way to the anticipated robbery, Davis stopped the car to allow Proctor, the group's protector, to retrieve his gun that he had forgotten.

In *United States v. Latham,* 2014U.S. App. LEXIS 14181 at 4-5 (4th Cir. July 25, 2014)*, the Fourth Circuit stated that* "An active participant in a drug transaction has the intent needed to aid and abet a § 924(c) violation when he knows [in advance] that one of his confederates will carry a gun." *Rosemond v. United States*, 134 S. CT. 1240, 1249, 188 L. Ed. 2nd 248 (2014)

## CONCLUSION

In accordance with the requirements of *Anders v. California,* 386 U.S.738 (1967) Counsel has reviewed the facts and legal issues in this case. Counsel is of the opinion that there are no legitimate ground for an appeal in this case. A copy of this brief has been served on the Defendant along with a letter advising him of the right to file a supplemental brief.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34 (a)(1) and this Court's

49

Local Rule 34(a), undersigned counsel suggests that this case maybe resolved on

the briefs and that oral argument need not be scheduled.

Respectfully submitted,

_____/S/_____

ARTHUR S. CHESLOCK

100 CHURCH LANE

BALTIMORE, MARYLAND 21208

410-559-3734

(Fax) 410-653-1546

acheslock@juno.com

## **CERTIFICATE OF COMPLIANCE WITH RULE 329(a)**

Type-Volume Certificate of Compliance with Limitation.
Typeface Requirements and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R.
   App. 32(a)(7)(B) because:

   The word count of this brief is <u>11,507</u>

2. This brief complies with the typeface requirements of Fed. R. App.
   P. 32(a)(5) because;

This brief has been prepared in a proportionally typeface using
Microsoft, Times New Roman, 14 point

December 29, 2015

_____/S/_____

ARTHUR S. CHESLOCK

# CERTIFICATE OF SERVICE

In accordance with Rule 25 of the Rules of the United States Court of Appeals For the Fourth Circuit, I hereby certify that I have this December 29, 2015, filed the required copy of the foregoing brief in the Office of the Clerk of the Court, via hand delivery and electronically filed the brief of Appellant using the Court's CM/ECF system which will send notification of this filing to the following counsel and have mailed a copy of the brief of Appellant:

James Wallner, AUSA
United States Attorneys' Office
36 S. Charles Street, Fourth Floor
Baltimore, Md. 21201

Antonio Davis
56068-o37
U.S.P. Florence High
US. Penitentiary
PO BOX 7000
Florence, Co. 81226

December 29, 2015

_____/S/_____
ARTHUR S. CHESLOCK
Counsel For Appellant